**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JORGE L. MONTIEL, | No. C 06-5486 SI |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| CITY AND COUNTY OF SAN FRANCISCO, | |
| Defendant. | |

Plaintiff Jorge Montiel has sued his employer, the City and County of San Francisco, alleging the city terminated him on account of his race, color, and national origin, and in retaliation for his complaints of discrimination, all in violation of 42 U.S.C. § 1981. Defendant now moves for summary judgment. On September 28, 2007, the Court heard argument on defendant's motion. Having considered the arguments of counsel and the papers submitted, the Court GRANTS the motion.

**FACTUAL BACKGROUND**

**1.     Plaintiff's employment with the city**

Plaintiff is a Hispanic of Mexican national origin. He is currently a Parking Control Officer ("PCO") for the city's Department of Parking and Traffic ("DPT").[1] Between August 1998 and January 2005, plaintiff worked as an Environmental Control Officer ("ECO") for the city's Department of Public Works ("DPW"). Montiel State Dep. 70:6-8; Declaration of Jorge Montiel ("Montiel Decl.") ¶ 3. An ECO's duties included education and enforcement of the city's codes regarding littering and illegal

---

[1] Deposition of Jorge Montiel in *Montiel v. City and County of San Francisco*, Superior Court Case No. 434-179 ("Montiel State Dep."), 66:18-23.

dumping. Montiel Decl. ¶ 3; Declaration of Mari Anderson ("Anderson Decl.") ¶ 3. The ECO unit was within DPW's Bureau of Street and Environmental Services ("BSES"). Anderson Decl. ¶ 3.

In 2001, BSES created two Senior ECO positions to supervise the unit's 16 ECOs.[2] In July 2001, DPW selected ECOs Robert Arevalo and Jody Monahan to staff those positions. Declaration of Jody Monahan in *Arevalo, supra* n.2 ("Monahan Decl.") ¶ 3. As Senior ECOs, Arevalo and Monahan supervised the office and field activities of the ECOs, including scheduling shifts, reviewing their citations, and assigning trucks and other equipment. Monahan Decl. ¶ 5.

Plaintiff describes the ECO unit as a "racially charged environment." Montiel Decl. ¶ 5. In declarations filed in this case and in his testimony during his state-court action, plaintiff recounted racially demeaning comments, improper job pressures to lie about an African-American co-worker, and retaliatory investigations into misconduct, most of which allegedly took place during 2001.[3] None of the decision-makers involved in plaintiff's lay-off from the ECO in January, 2005 was alleged to be involved in the racially charged statements or actions.

**2. ECO layoffs**

Beginning in 2001, San Francisco, like many other cities, faced an economic slowdown. Every year from FY 2001-02 to FY 2004-05, the city made midyear spending reductions, and the Mayor's Office required departments to make large budget cuts.

**A. 2003 layoffs**

DPW is a General Fund department that relies heavily on discretionary city-wide revenue primarily derived from local property, sales, and payroll taxes. Declaration of Robert Carlson ("Carlson Decl.") ¶ 3. In late 2002, the Mayor's Office directed DPW to eliminate its projected General Fund

---

[2] Declaration of Scott Shaw in *Arevalo et al. v. City and County of San Francisco*, Superior Court Case No. 445-987 ("Shaw Decl.") ¶ 3.

[3] These allegations formed the basis for plaintiff's state-court action, *Montiel v. City and County of San Francisco*, Superior Court Case No. 434-179, in which he alleged that the city discriminated against him and harassed him on the basis of his race and national origin, and that it retaliated against him for his complaints of discrimination, all in violation of the Fair Employment and Housing Act ("FEHA"). Plaintiff's layoff was not a subject of that action.

2

budget deficit at BSES, and to reduce its reliance on the General Fund by 3% during the remainder of the year. Declaration of Edwin Lee ("Lee Decl.") ¶ 3.

DPW proposed eliminating 8 of the 16 ECO positions, but the Mayor's Office demanded more cuts, so DPW sent layoff notices to the entire unit in January 2003. Lee Decl. ¶ 4 & Ex. A. Meanwhile, Deputy Director of Operations Mohammed Nuru worked to determine whether the ECO unit could sustain itself by generating increased revenue from citations, and the ECOs lobbied the Board of Supervisors to save the unit. Declaration of Mohammed Nuru ("Nuru Decl.") ¶ 5; Carlson Decl. ¶ 4; Lee Decl. ¶ 5. These efforts ultimately helped persuade the Board to pass an ordinance that allowed DPW to retain 8 of the 16 ECO positions, as well as both Senior ECO positions. Ordinance No. 0087-03 (attached as Ex. B Def.'s First Req. for Judicial Notice ("RJN")); Lee Decl. ¶¶ 5, 6; Carlson Decl. ¶ 5. The ordinance resulted in the layoff of the eight least senior ECOs. Declaration of Tammy Wong ("Wong Decl.") ¶ 6. Plaintiff was among the remaining ECOs in the reorganized unit. Montgomery Decl. ¶ 5; *see* Montiel Decl. ¶ 3.

Nevertheless, raising revenue remained an ongoing concern. *See* Montiel Fed. Dep. 109:13-112:15. Following the first layoff, Deputy Director of Operations Neru told Senior ECO Robert Arevalo on more than one occasion that the ECOs needed to write more tickets to raise revenue. Deposition of Robert Arevalo in *Arevalo*, *supra* n.2 ("Arevalo Dep.") 184:16-187:4. Arevalo testified that at one meeting, Nuru told the ECOs, "You need to bring more revenue in." *Id.* He further testified that Neru told the ECO's they should all be fired. *Id.* Arevalo stated, "I think he wanted to boost our morale. Scare us into writing more tickets, more tickets, more tickets." *Id.* at 184:17-19.

**B.    2005 layoffs**

Although the ECO unit did increase its revenues collected, it did not raise enough to sustain itself and still relied heavily on General Fund monies. Carlson Decl. ¶ 6; Nuru Decl. ¶ 8; Lee Decl. ¶ 7; Montgomery Decl. ¶ 10.

In late 2004, the Mayor's Office again required midyear budget cuts in part due to the failure of two tax measures on the November 2, 2004 ballot. Carlson Decl. ¶ 7. DPW was required to cut $2.7 million from its General Fund budget over an 18-month period. *Id.* ¶ 9. BSES had the largest General

3

1  Fund budget of the five DPW bureaus to receive General Fund money, accounting for about sixty-two
2  percent of the general funds used by DPW. *Id.* ¶ 3. Thus, BSES was required to make the largest cuts.
3  *Id.* ¶ 8.

4  The Mayor's Office directed DPW to avoid curtailing direct public services in making the cuts.
5  Lee Decl. ¶ 8. Accordingly, DPW attempted to minimize cuts to services such as tree maintenance and
6  litter and debris removal. *Id.* Eliminating ECO's secondary service of enforcing litter law through
7  citations would not impact direct service. *Id.* ¶ 9.

8  Ultimately, the elimination of the ECO unit accounted for nearly $700,000 of the $2.7 million
9  of the Mayor's required cuts. Carlson Decl. ¶ 9.

10  On November 14, 2004, DPW sent out notices to the remaining ECOs, including plaintiff,
11  informing them that they would be laid off effective January 14, 2005. Wong Decl. ¶ 8. According to
12  the Civil Service Rules, the laid-off permanent employees were entitled to (1) bump into another
13  position in their classification if they had more permanent seniority than the person currently in that
14  position, (2) reinstatement to an open position in a class in which they had prior permanent status, or
15  (3) placement in a vacant available position in a similar class. Declaration of Kerry Ko ("Ko Decl.")
16  ¶ 3.

17  The first option was not available to plaintiff or the other ECOs because no other city department
18  employed ECOs. *Id.* ¶ 5. The second option was also unavailable because none of the ECOs had held
19  a permanent position in a classification other than ECO or Senior ECO. *Id.* Only the third option was
20  available – placement in an available position in a similar class, known as "near-listing." *Id.* Near-list
21  appointments are temporary civil service ("TCS") appointments because the employee has not passed
22  the civil service exam required for permanent status in the new position. Ko Decl. ¶ 5; *see* Civil Service
23  Commission ("CSC") Rule 114.21.

24  DHR determines the positions employees may be near-listed to. CSC Rule 121.14.3; Ko Decl.
25  ¶ 6. Employees may not be near-listed for a position that is more than 7.5% higher in salary than the
26  prior position. *Id.* DHR determined that four classifications were appropriate near-list appointments
27  for the ECOs: Parking Control Officer, Building & Grounds Patrol Officer, Police Service Aide, and
28  Airport Police Service Aide. Ko Decl. ¶ 6. Near-list appointments are by seniority, with the most senior

4

employees near-listed first. *Id.*

Once the layoffs were announced, DPW held meetings with the ECOs to explain the layoff and near-list process. Wong Decl. ¶ 9; Deposition of Jorge Montiel in this case ("Montiel Fed. Dep.") 30:9-31:14.

Eight of the laid-off ECOs were immediately offered near-list appointments. Six ECOs, including plaintiff, were offered positions as Parking Control Officers, while two took positions as Building and Grounds Patrol Officers. Ko Decl. ¶¶ 7-9. Monahan and Jonathan Vanig, who were lowest on the seniority list, were the only ones without near-list appointments.

### C. Post-layoff conduct

Following the layoffs, DPW was still responsible for handling the outstanding citations issued by the ECOs and the protest hearings challenging those citations. Lee Decl. ¶ 12. DPW decided to have the Bureau of Street Use and Mapping ("BSUM") handle these responsibilities. *Id.* DPW was also made responsible for handling enforcement of the Sign Ordinance, since BSUM was already responsible for issuing sign permits and enforcing codes relating to garbage cans and the public right of way. *Id.*

Defendant contends that these additional responsibilities created a need for additional temporary staffing. In early January, Lee referred Monahan and Anderson to BSUM director Barbara Moy and both women submitted letters of interest to Moy regarding Street Inspector positions. Monahan Decl. ¶ 16; Anderson Decl. ¶ 8. Anderson had significant experience in enforcement of the complicated Sign Ordinance. Anderson Decl. ¶ 4; Moy Decl. ¶ 7; Lee Decl. ¶ 13; Montgomery Decl. ¶ 15. Monahan had previously worked as a Street Inspector at BSUM and was familiar with the citation protest hearings as part of her duties as a Senior ECO. Monahan Decl. ¶ 15; Moy Decl. ¶ 7.

DPW appointed Monahan and Anderson to temporary-exempt as-needed Street Inspector positions at BSUM on January 14, 2005. Monahan Decl. ¶ 16; Moy Decl. ¶ 7. These positions did not provide employee benefits such as vacation time, paid sick time, or holiday pay. Wong Decl. ¶ 10.

### 3. Plaintiff's employment following the 2005 layoffs

On November 15, 2004, DPW sent plaintiff a notice that he was to be laid off from his ECO

5

position due to lack of funds. Montiel Fed. Dep. 12:15-22:4 & Ex. 5 thereto. On January 3, 2005, DHR near-listed plaintiff to the position of Parking Control Officer. Plaintiff accepted that position and on January 18, 2005 he became a Temporary Civil Service ("TCS") employee as a PCO with no break in city service. Montiel Fed. Dep. 33:13-36:8 & Exs. 7 & 8 thereto; *see also* Montiel State Dep. 68:4-6, 66:18-23.

In March 2006, the Civil Service Commission granted plaintiff permanent civil service status in the PCO position. Montiel fed 37:2-38:1 & Ex. 9 thereto. In July 2006, plaintiff voluntarily resigned from the PCO position in order to "get better" and to "relieve [his] stress." Montiel fed 159:1-25.

In February 2007, plaintiff asked the city to reinstate him to the PCO position. Montiel Fed. Dep. 172:6-173:3 & Ex. 15 thereto. In March 2007, the city reappointed plaintiff to the PCO position, with permanent civil service status. Montiel Fed. Dep. 176:2-178:16 & Ex. 16 thereto.

**PROCEDURAL HISTORY**

Plaintiff filed this action in this Court on September 7, 2006, alleging that the layoff of his ECO unit amounted to a violation of 42 U.S.C. § 1981.

By the time this action was filed, plaintiff had been litigating his state-court action, *Montiel v. City and County of San Francisco*, Superior Court Case No. 434-179, for about two years. That action alleged that the city discriminated against him and harassed him on the basis of his race and national origin, and that it retaliated against him for his complaints of discrimination, all in violation of the Fair Employment and Housing Act ("FEHA"), but plaintiff's layoff was not a subject of the action. On October 17, 2006, the state court granted defendant's motion for summary adjudication on plaintiff's causes of action for discrimination and retaliation. Def.'s First RJN Ex. E. The case went to trial on January 29, 2007, on plaintiff's remaining harassment cause of action. The jury rendered a verdict for the city, and judgment was entered on February 27, 2007. Def.'s First RJN Ex. F. On May 4, 2007, plaintiff filed a Notice of Appeal on the summary adjudication order and on the jury verdict. Def.'s First RJN Ex. G. The case is currently pending on appeal.

Now before the Court is defendant's motion for summary judgment on plaintiff's claims that his layoff amounted to discrimination and retaliation in violation of 14 U.S.C. § 1981.

6

**LEGAL STANDARD**

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The party requesting summary judgment has the initial burden to show that there are no genuine issues of material fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 632 (9th Cir. 1987). The party moving for summary judgment may satisfy its burden of production by submitting affirmative evidence that negates an essential element of the nonmoving party's claim or by demonstrating to the court that the nonmoving party's evidence is insufficient to establish an essential element its claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If the moving party meets its initial burden, then the burden shifts to the nonmoving party to point to portions of pleadings, admissions, answers to interrogatories, and depositions which, along with any affidavits "designate 'specific facts showing that there is a genuine issue for trial.'" *See Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991) (citing *Celotex*, 477 U.S. at 323).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the nonmoving party. *See T.W. Elec.*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(e). A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Hearsay statements found in affidavits are inadmissible. *See, e.g., Fong v. Am. Airlines, Inc.*, 626 F.2d 759, 762-63 (9th Cir. 1980).

**DISCUSSION**

Defendant now moves for summary judgment on the ground that plaintiff's claims that his layoff amounted to race and national origin discrimination and retaliation fail because (a) plaintiff cannot establish a *prima facie* case on those claims, and (b) plaintiff also cannot rebut defendant's legitimate,

7

non-discriminatory reasons for its actions with evidence of pretext. Defendant also contends that plaintiff cannot establish municipal liability under 42 U.S.C. § 1981. Def.'s Mot. for Summ. J. ("Motion") at 1. Plaintiff agrees that those are the issues before the Court. Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Opposition") at 20.

**1.    Unlawful discrimination**

Plaintiff sues under 42 U.S.C. § 1981, which was originally § 1 of the Civil Rights Act of 1866:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . .
>
> . . .
>
> The rights protected by this section are protected against . . . impairment under color of State law.

Section 1981 creates a federal damages action against both private and public actors for discriminatory breaches of contract. *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204 (9th Cir. 1996).

Discrimination claims under section 1981 are analyzed using the same burden-shifting framework as claims under Title VII. *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 850 (9th Cir. 2004). Under the widely used *McDonnell Douglas* framework, plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Then, the burden shifts to the employer to respond with a legitimate, nondiscriminatory reason for its actions. *Id.* The burden then shifts back to plaintiff to establish that the employer's articulated reason was a "pretext" or cover-up for unlawful discrimination. *Id.*

**A.    Plaintiff's *prima facie* case**

Plaintiff may establish a *prima facie* case of discrimination under the *McDonnell Douglas* framework by showing that: "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson v. Hewlett-Packard Co.*, 358

8

1 F.3d 599, 604 (9th Cir. 2004). The Ninth Circuit has repeatedly emphasized that a plaintiff's burden in establishing a *prima facie* case of discrimination is "minimal." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1094 (9th Cir. 2005).

Here, defendant concedes that plaintiff has met the first three parts of his *prima facie* burden on his race and national origin discrimination claims. Motion at 12. Defendant contends, however, that plaintiff has failed to satisfy the fourth part of his *prima facie* burden. *Id.*

Plaintiff alleges that the city terminated his employment as an ECO on account of his race, color and national origin. Complaint at 2. In support of his allegation, plaintiff contends that Mari Anderson and Jody Monahan, the only two white persons among the group of eight permanent civil service ECOs who were laid off, were never really laid off. Opposition at 22. Plaintiff contends that they were promoted to the higher-paid positions of "temporary exempt" Street Inspectors and ultimately placed in the position of permanent civil service Street Inspectors at significantly higher pay than the six Hispanic, African-American and Asian-American ECOs who were ultimately near-listed to lower paying positions in other offices. *Id.* Plaintiff presents evidence that in their new roles, Anderson and Monahan both earn at least $10 more per hour than plaintiff. Anderson Dep. 11:12-13; Monahan Dep. 26:4-6.[4] Plaintiff also contends that Anderson and Monahan "knew before January 14, 2005, that they would not be laid off but instead be promoted to and placed in the Street Inspector positions." Opposition at 23 (citing generally to Monahan Dep.). However, plaintiff admits he also was offered and accepted his near-list position prior to the layoff taking effect, making plaintiff's second argument irrelevant. Opposition at 3 n.3; Montiel Fed. Dep. 33:13-36:8 & Exs. 7 & 8 thereto. Plaintiff further contends that DPW Director Edwin Lee created the temporary exempt street inspector positions for Anderson and Monahan, and that he personally selected them for the roles. Opposition at 23. However, plaintiff cites to no evidence in support of this assertion, and offers no evidence for many other claims in his opposition papers. *Id.* Instead, plaintiff casts doubt on his own qualifications for the position by admitting he did not pass the civil service examination for the permanent Street Inspector position in

---

[4]Plaintiff and defendant present different numbers for the actual rates of pay for Anderson, Monahan, and plaintiff, but both parties agree that the gap is at least $10 per hour. *See* Opposition at 22; *see also* Reply at 2 n.2.

9

the fall of 2005. Montiel Decl. ¶ 127.

Defendant contends that Monahan and Anderson were treated the same as plaintiff in the layoff process because they too were laid off from their ECO positions. Defendant argues that DPW had discretion to appoint whomever it felt was suited for the as-needed positions it had created to address the outstanding citations and protest hearings, because those positions were temporary and exempt from civil service rules. Motion at 12 (citing Lee Decl. ¶¶ 12, 13; Wong Decl. ¶ 10). Regarding plaintiff's argument that Anderson and Monahan's temporary exempt positions were highly preferable to plaintiff's near-list appointment, defendant argues that the former were far less secure than the latter because they were at-will, temporary, and as-needed. Opposition at 3 (citing Wong Decl. ¶ 10). Furthermore, Anderson and Monahan were not entitled to accrue vacation, sick leave, floating holiday pay, or regular holiday pay. In contrast, plaintiff's Temporary Civil Service ("TCS") Appointment entitled him to all of those benefits as well as retirement and health service system benefits. Opposition at 3 (citing Wong Decl. ¶ 10; Ko Decl. ¶ 5).

The Court finds that plaintiff's showing on the fourth part of his *prima facie* burden is weak. However, given the evidence of the $10 per hour pay difference -- roughly fifty percent more money than plaintiff earns in an hour -- the Court will treat the threshold showing of disparate treatment as having been made. The burden therefore shifts to defendant.

### B.     Defendant's reason for its actions

Where a plaintiff produces sufficient evidence to establish a *prima facie* case, the burden shifts to defendant to *articulate* (not to prove) a "legitimate nondiscriminatory reason" for the adverse employment action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 354-55 (1981). "Legitimate" reasons are factually unrelated to prohibited bias, and therefore, if true, would preclude a finding of discrimination. *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

Here, defendant has articulated -- and presented ample evidence to support -- a legitimate, nondiscriminatory reason for laying off plaintiff along with the rest of the ECO unit: (1) following several years of budget cuts, the Mayor's Office required DPW to cut $2.7 million from its general fund over an 18-month period, commencing in January 2005, Carlson Decl. ¶¶ 7-9; (2) BSES was required

10

to make the largest cuts of any bureau in DPW because it accounted for about sixty-two percent of the general funds used by DPW, Carlson Decl. ¶ 8; (3) the Mayor's Office had asked the department to avoid curtailing direct public services, Lee Decl. ¶¶ 8,9; and (4) eliminating the ECO unit allowed DPW to make a $700,000 dent in its $2.7 million goal, Carlson Decl. ¶ 9. *See Winarto v. Toshiba Am. Elec. Components, Inc.,* 274 F.3d 1276, 1295 (9th Cir. 2001) (holding that a reduction in force constituted a legitimate, nondiscriminatory reason for terminating employee).

Defendant has also articulated and supported legitimate and nondiscriminatory reasons for appointing Monahan and Anderson to the exempt, as-needed Street Inspector positions: Lee referred Anderson and Monahan for these positions because of their prior significant experience with Sign Ordinance enforcement, and the department was not required to take into consideration employees' seniority in filling those positions because they were as-needed and were not near-list positions. Wong Decl. ¶ 9.

Defendant's burden to articulate a legitimate reason, like plaintiff's burden to make his *prima face* case, is not onerous. *Bd. of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 (1978). To respond to budgetary pressures by eliminating the ECO unit, and to handle outstanding citations and hearings, defendant created temporary, exempt positions and filled them with people who had appropriate experience. This is a legitimate explanation for defendant's actions. Defendant has met its burden on this step under *McDonnell Douglas*. The presumption of discrimination created by plaintiff's *prima facie* case, "having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993).

### C. Plaintiff's showing of pretext

A plaintiff may meet the burden to show pretext using either direct or circumstantial evidence. Direct evidence is evidence that, "if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998). Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer. *See, e.g., Godwin*, 150 F.3d at 1221 (supervisor stated he "did not want to deal with [a] female"); *Cordova*, 124 F.3d at 1149. Circumstantial evidence includes evidence "showing that the

employer's proffered explanation for the adverse action is 'unworthy of credence.'" *Coghlan*, 413 F.3d at 1095 (quoting *Burdine*, 450 U.S. at 256).

Although plaintiff's declaration includes various claims about a racially charged environment in the department in 2001, no racial comments are attributed to the decision makers for the 2005 layoff of the entire ECO unit, and no direct evidence is presented that a discriminatory or retaliatory motive formed the basis of the decision makers' actions.

Instead, plaintiff argues that he has presented circumstantial evidence that defendant's budgetary reasons for closing the ECO unit are "unworthy of belief." Opposition at 23-24. Plaintiff supports his contention by asserting that between July 2003 and December 2004, Director Lee had told the ECOs that they were "ambassadors," and that they should not write tickets. *Id.* Plaintiff also asserts that both Director Lee and Deputy Director Nuru frequently pulled or canceled lawful citations as political and personal favors. *Id.* Plaintiff's brief does not cite to any evidence in support of either assertion.[5] In any event, plaintiff's argument is contradicted by his own deposition testimony: when the 2003 layoffs of eight of the ECOs (including plaintiff) were rescinded, "Ed Lee and Mohammed Nuru . . . said that we have to write tickets because they're going to try to fund the position from the tickets we wrote." *See* Montiel Fed. Dep. 109:13-112:5.

Regarding defendant's reason for placing Anderson and Monahan in temporary exempt Street Inspector roles, plaintiff contends that Monahan and Anderson had less seniority than the other permanent civil service ECOs, that Monahan had no recent experience as a Street Inspector, and that Anderson had been trained by Montiel in enforcement of the Sign Ordinance. Opposition at 24. Again,

---

[5]The Court searched the record for support of plaintiff's allegation, and found only the following passage from plaintiff's own declaration:

> At the June 13, 2001 1:00 P.M., meeting with all Environmental Control Officers, Cone discussed citations by the ECO's stating that our "numbers" were down. When I politely said that Mohamed Nuru, Deputy Director, in the presence of Director Ed Lee, told us "not to write any citations, unless we really had to, and that we were ambassadors," Cone rudely in front of all ECO officers and supervisors, told me to "shut up" and viciously hit me on the leg. I was so shocked, intimidated and humiliated, I did not know what to do.

Montiel Decl. ¶ 43. Even assuming the ECOs were told not to write tickets in 2001, this has no bearing on the veracity of the city's contention that it needed to eliminate the positions as a result of its budget problems in 2003 through 2005.

12

1  plaintiff's brief cites to no evidence in support of those assertions. Instead, plaintiff cites to his own
2  declaration to support the assertion that he had performed his job satisfactorily, and he asks the Court
3  to take judicial notice of the jury verdict in his state court action against the city (without providing the
4  Court a copy of the verdict). *Id.* at 25. In that action, the jury found that plaintiff had been subjected
5  to unwanted harassing conduct because of his national origin, but that the harassment was not so severe
6  that a reasonable person in plaintiff's position would have considered the work environment hostile or
7  abusive. Def.'s First RJN Ex. F. The Court fails to see how this helps plaintiff. The harassment that
8  was the subject of the state court case was not related to Lee or Barbara Moy, or their subsequent
9  actions.

10  Defendant contends that plaintiff cannot establish pretext because, "while plaintiff may claim
11  he had more seniority than Anderson and Monahan, he cannot honestly claim he had more experience."
12  Reply at 6. Plaintiff joined DPW as a provisional ECO in late 1998 and became permanent in March
13  1999. Montiel Fed. Dep. 88:3-39:5. Monahan was a permanent ECO from 1990 to 1998, and was a
14  provisional Street Inspector from 1998 to 1999. Monahan Decl. ¶ 3. After leaving DPW for two years,
15  she returned as an ECO in February 2001, and was appointed Senior ECO in June 2001. *Id.* She
16  remained in that position until the January 2005 layoff. *Id.* Defendant contends that plaintiff is "senior"
17  to Monahan only in a technical sense: his appointment date precedes hers because she left DPW in 1999
18  and returned in 2001. Reply at 6.

19  Anderson became an ECO in 1999, less than one year after plaintiff did. Anderson Decl. ¶ 3.
20  Defendant contends that, due to plaintiff's extended leaves between June 2003 and October 2003, and
21  again between November 2003 and January 2005, Anderson likely accrued more hours of experience
22  as an ECO than plaintiff did. Reply at 6; Montiel State Dep. 107:16-108:2, 474:20-479:1, 547:6-550:3;
23  Montiel Fed. Dep. 23:8-11, 74:2-75:4. Although plaintiff may have trained Anderson, his deposition
24  testimony indicates this occurred in 1999 when she first arrived. *See* Montiel Fed. Dep. 89:10-12.
25  Additionally, in mid-2004 Anderson became the primary ECO responsible for education and
26  enforcement of the Sign Ordinance. Anderson Decl. ¶ 4; Montgomery Decl. ¶ 15. By that time,
27  plaintiff had already been on leave for a significant period, and he was still on leave on the ECO's final
28  day of work on January 14, 2005. Montiel State. Dep. 475:25-447:9. Plaintiff's psychologist

13

recommended he return to work in his new role when she learned that he would no longer be reporting to DPW, suggesting the change might be good for him. *Id.* at 447:10-478:3.

Plaintiff's contention that he was technically more "senior" than Anderson and Monahan does not establish pretext because the evidence shows he had less actual experience than either woman. Moreover, plaintiff was on leave when Lee recommended the women for the temporary, as-needed positions because of their particularized expertise.

The Court finds that this is an instance where, "although the plaintiff has established a prima facie case . . . no rational factfinder could conclude that the action was discriminatory." *Reems v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact . . . ."). The Court may not "find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (citing *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996) (finding a plaintiff's uncorroborated and self-serving deposition testimony did not present a sufficient disagreement to require submission to a jury)) (internal citation and quotation marks omitted); *Johnson v. Wash. Metro. Area Transit Auth.*, 883 F.2d 125, 128 (D.C. Cir. 1989) ("The removal of a factual question from the jury is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined . . . by other credible evidence . . . ."). Accordingly, the Court finds plaintiff has not met his burden on his discrimination claim.

### 2.  Retaliation

Plaintiff alleges that his termination was not only discriminatory, but that it was in retaliation for his prior complaints about discrimination at the department. Complaint ¶¶ 7-8.

Claims of retaliation under section 1981 also are analyzed under the *McDonnell Douglas* burden shifting framework. *Manatt v. Bank of Am.*, 339 F.3d 792, 800-01 (9th Cir. 2003) (holding that a claim of retaliation for complaining to superiors about racial discrimination is cognizable under section 1981). To establish a *prima facie* case of retaliation, plaintiff must show that (1) he engaged in protected

activity, (2) that the city subjected him to an adverse employment action, and (3) a causal link exists between the protected activity and the employer's action. *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000). Plaintiff is unclear in his complaint about the precise nature of his retaliation claim. His deposition testimony, however, suggests that the retaliatory act was his layoff in 2005. Montiel Fed. Dep. 100:1-10. Plaintiff contends that he engaged in "protected activity" in 2001 when he "refused to be coerced by [his] supervisors to participate in unlawful discriminatory practices against African Americans and complain[ed] to [his] supervisors about such unlawful discriminatory practices." Montiel Decl. ¶ 19.

Neither party addresses the sufficiency of plaintiff's *prima facie* case of retaliation in their briefs. *See* Motion at 17-18; Opposition at 25–26; Reply at 7. Instead, the parties focus on whether plaintiff has met his burden to present evidence that defendant's articulated reason for its conduct is merely pretext for a retaliatory motive. *Id.* In doing so, the parties simply re-hash the arguments they made with respect to plaintiff's discrimination claim. *Id.* Defendant refers the Court to the reasons it offered regarding its budgetary constraints and its immediate need to handle outstanding citations and protest hearings, and plaintiff repeats his assertions about his seniority relative to Monahan and Anderson. *Id.*

Just as plaintiff's scant, uncorroborated, self-serving testimony fails to meet his burden with respect to his discrimination claim, so too does it fail here with respect to his retaliation claim. In neither case has plaintiff presented evidence sufficient to create a question of fact for a jury.

### 3. Municipal liability

In addition to attacking plaintiff's claims on their merits, defendant makes a powerful argument that plaintiff's discrimination and retaliation claims fail because he cannot show municipal liability as a matter of law. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1977); *Fed'n of African Am. Contractors*, 96 F.3d at 1214-15. Plaintiff's counter-argument does not strike with the same force. However, because the Court has found that plaintiff failed to meet his burden on the merits of his discrimination and retaliation claims, the Court need not decide the issue of municipal liability.

**CONCLUSION**

For the foregoing reasons, and for cause shown, the Court GRANTS defendant's motion for summary judgment (Docket No. 32). The Court also GRANTS defendant's first, second, and third requests for judicial notice (Docket Nos. 33, 40, and 44), and plaintiff's first and second requests for judicial notice (Docket Nos. 38 and 43).

**IT IS SO ORDERED.**

Dated: October 1, 2007

SUSAN ILLSTON
United States District Judge